In re W.J. CLARK COMPANY, LTD.

Joint Administration with W. Joseph Clark, a/k/a William Joseph Clark, Martha L. Clark, Debtors.

WESTINGHOUSE CREDIT CORPORATION, Plaintiff,

v.

W.J. CLARK CO., LTD.

and

Samuel Alper, Trustee

and

Hamilton Bank, formerly National Central Bank

and

Roper Corporation

and

Central Capital Corporation

and

Borg-Warner Acceptance Corporation, Defendants.

Bankruptcy No. 81–04300G.
Adv. No. 81–1615G.

United States Bankruptcy Court, E.D. Pennsylvania.

June 10, 1983.

Mary D. Colins, Philadelphia, Pa., for plaintiff, Westinghouse Credit Corp.

Alexander N. Rubin, Jr., Robert Szwajkos, Rubin, Quinn & Moss, Philadelphia, Pa., for the debtor, defendant, W.J. Clark Co., Ltd.

Samuel Alper, Philadelphia, Pa., defendant/trustee.

William A. Harvey, Fellheimer, Eichen & Goodman, Philadelphia, Pa., for defendant, Samuel Alper, trustee.

Robert H. Kauffman, Rhoda, Stoudt & Bradley, Reading, Pa., for defendant, Hamilton Bank, formerly Nat. Central Bank.

Samuel L. Hirshland, Liebert, Short, FitzPatrick & Lavin, Philadelphia, Pa., for defendant, Roper Corp.

Richard E. Fehling, Stevens & Lee, Reading, Pa., for defendant, Central Capital Corp.

Jay E. Goldfarb, Philadelphia, Pa., for defendant, Borg-Warner Acceptance Corp.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issue before us is whether a creditor has a security interest in a debtor's inventory and proceeds where the creditor fails to produce a formal, written security agreement evincing an intention to create a security interest therein. We conclude that the creditor has no security interest in the collateral in question because no writings were produced, other than a financing statement, which were signed by the debtor and which established a mutual intent to create a security interest in the subject collateral.

The facts of the instant case are as follows:[1] On October 20, 1981, W.J. Clark Company, Ltd. ("the debtor") filed a petition under chapter 7 of the Bankruptcy Code ("the Code"). On November 12, 1981, Westinghouse Credit Corporation ("Westinghouse") filed a complaint for relief from the automatic stay provisions of section 362(a) of the Code against the debtor, Samuel Alper ("the trustee"), Hamilton Bank ("the bank"), Roper Corporation ("Roper") and Central Capital Corporation ("Central"). On November 19, 1981, Westinghouse filed an amended complaint for relief from the stay to include Borg-Warner Acceptance Corporation ("Borg-Warner") as a defendant. In its amended complaint, Westinghouse requests, *inter alia,* that the automatic stay be modified in order to permit it to retain certain inventory which it had repossessed from the debtor on October 6, 1981. On December 30, 1981, Roper filed an answer and counterclaim to Westinghouse's complaint wherein it alleged a valid and perfected purchase money security interest in certain of the debtor's inventory which Westinghouse had repossessed. From May 11, 1981, until September 21,

---

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

1981, Roper sold goods to the debtor for which, Roper alleges, the debtor owes it $125,956.76. Roper also filed a cross-claim against the bank.[2] In addition, both the bank and Central filed counterclaims against Westinghouse. However, at the trial of the instant complaint, it was agreed that Roper could proceed first and, accordingly, only testimony concerning Roper's claims was submitted. At the close of the first day of trial, Roper moved to have its counterclaim and crossclaim amended to conform with the evidence and also to have its pleading considered as a complaint for relief from the automatic stay against the trustee (N.T. 3/10/82 at 121). The trustee consented to the aforesaid request and filed an answer denying the allegations in Roper's complaint (N.T. 3/31/82 at 8). Roper's contention is that, in order to be entitled to relief from the stay, it need only prove that it sold goods to the debtor for which it is yet unpaid and that it has an enforceable perfected security interest in these goods. Consequently, we will address only the narrow issue of whether Roper had a perfected security interest in the debtor's goods that were repossessed by Westinghouse.

At trial of the instant complaint, Arthur Hall, a district manager and salesman for Roper, testified that he personally saw Don McLaughlin ("McLaughlin"), an officer of the debtor corporation, sign a security agreement on the debtor's behalf (N.T. 3/10/82 at 21, 22) and that he mailed the security agreement to Roper's corporate offices shortly thereafter (N.T. 3/10/82 at 24).[3] In addition, June Harling, Roper's credit manager, testified that the signed security agreement was received by Roper on May 11, 1981 (N.T. 3/10/82 at 49). On the other hand, Joseph Clark, the debtor's president, testified that he never signed a security agreement with Roper and that he had no knowledge of any security agreement having been executed between Roper and the debtor (N.T. 3/10/82 at 106, 107). In short, the only fair conclusion that can be drawn from the testimony adduced at trial is that Roper alleges the execution and existence of a security agreement which the debtor denies. The fact remains that Roper, who claims to have a perfected security interest in the debtor's inventory, produced no signed security agreement or copy thereof. However, standing alone, Roper's failure to produce a written security agreement is not fatal to its case.

In *Matter of Bollinger Corp.*, 614 F.2d 924 (3d Cir.1980), the Court of Appeals for the Third Circuit held that a creditor could assert its secured claim against the debtor notwithstanding the fact that no formal security agreement was ever signed between the two parties. The court articulated the requirements for creating a perfected security interest in a debtor's collateral and the policies behind those requirements:

> Under Article Nine of the U.C.C., two documents are generally required to create a perfected security interest in a debtor's collateral. First, there must be a 'security agreement' giving the creditor an interest in the collateral. Section 9–203(1)(b) contains minimal requirements for the creation of a security agreement. In order to create a security agreement, there must be: (1) a writing (2) signed by the debtor (3) containing a description of the collateral or the types of collateral. Section 9–203, Comment 1. The requirements of section 9–203(1)(b) further two basic policies. First, an evidentiary function is served by requiring a signed security agreement and second, a written agreement also obviates any Statute of Frauds problems with the debtor-creditor

---

2. Roper's crossclaim deals with goods of the debtor that were allegedly repossessed by Hamilton Bank and with some of the debtor's accounts receivable which Hamilton Bank allegedly has control over. However, we will deal only with the question of whether Roper had a security interest in the inventory which it sold to the debtor and which is now in the possession of Westinghouse.

3. Conversely, Rodney O'Hara, a district manager for Westinghouse, testified that McLaughlin, who is deceased, told him that no security agreement with Roper was signed or would be signed (N.T. 3/31/82 at 10, 11).

relationship. *Id.* Comments 3, 5. The second document generally required is a 'financing statement,' which is a document signed by both parties and filed for public record. The financing statement serves the purpose of giving public notice to other creditors that a security interest is claimed in the debtor's collateral.

614 F.2d at 926.

However, the court held:

> We think Pennsylvania courts would ... reject the ... rule imposing the requirement of a formal grant of a security interest before a security agreement may exist. When the parties have neglected to sign a separate security agreement, it would appear that the better and more practical view is to look at the transaction as a whole in order to determine if there is a writing, or writings, signed by the debtor describing the collateral which demonstrates an intent to create a security interest in the collateral.

614 F.2d at 928.

■ The relevant writings in *Bollinger* consisted of: (1) a financing statement signed by the debtor containing a detailed list of all the collateral intended to secure the particular obligation; (2) a promissory note which made specific reference to a security agreement that was "to be deliv-

ered;"[4] and (3) correspondence between the parties which constituted a course of dealing that established that the parties intended to create a security interest in the collateral in question. The *Bollinger* Court held that the aforesaid documents met the requirements of section 9–203(1)(b) of the Uniform Commercial Code.[5] In the case *sub judice,* it is undisputed that the debtor signed a financing statement describing the collateral. However, as the court in *Bollinger* stated:

> [T]he financing statement provides only an inferential basis for concluding that the parties intended a security agreement. There would be little reason to file such a detailed financing statement unless the parties intended to create a security interest. The intention of the parties to create a security interest may be gleaned from the expression of future intent to create one in the promissory note and the intention of the parties as expressed in letters constituting their course of dealing.

614 F.2d at 928.

Roper contends that the signed financing statement together with three separate writings (Roper exhibits 6, 7 and 8) provide an inferential basis for concluding that Roper and the debtor intended to create a

---

4. The promissory note in *Bollinger* provided:
   *Security.* This Promissory Note is secured by security interests in a certain Security Agreement between Bollinger and Industrial Credit Company ... and in a Financing Statement filed by [ICC] ..., and is further secured by security interests *in a certain security agreement to be delivered* by Bollinger to Z and J with this Promissory Note covering the identical machinery and equipment as identified in the ICC Agreement and with identical schedule attached in the principal amount of Eighty-Five Thousand Dollars. ($85,000) (emphasis added).
   614 F.2d at 925.

5. Section 9203 of the Pennsylvania Commercial Code provides, in pertinent part:
   § 9203. Attachment and enforceability of security interest; proceeds, formal requisites
   (a) Enforceability.—Subject to the provisions of section 4208 on the security interest of a collecting bank and section 9113 on a security interest arising under the division on

sales, a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
   (1) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned;
   (2) value has been given; and
   (3) the debtor has rights in the collateral.
   (b) Attachment.—A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (a) have taken place unless explicit agreement postpones the time of attaching.
   \*　\*　\*　\*　\*　\*
   13 Pa.Cons.Stat.Ann. § 9203 (Purdon Pamphlet 1983).

security interest in the subject collateral.[6] We disagree. The first document is an inter-office memo between two Roper employees [7] and the other two writings consist of notations made on the desk pad of a Roper employee.[8] We fail to see how these three writings constitute "a course of dealing" establishing a mutual intent to create a security interest in collateral within the meaning of *Bollinger.* Aside from the financing statement, none of the writings relied on by Roper are even signed by debtor. Even if we were to assume that the signature of "Don" on Roper exhibit 8 is the signature of Don McLaughlin, an officer of the debtor, the language appearing above the signature makes no mention whatsoever of a security agreement having been executed or of a future intention to create such.[9] Rather, we find that Roper's attempt to establish the creation of a security agreement through the use of the financing statement and Roper exhibits 6, 7 and 8 falls far short of the standards enunciated by the Third Circuit in *Bollinger* for establishing the existence of secured claim when no written security agreement is produced. Consequently, we conclude that Roper cannot assert a secured claim against the debtor because the requirements of section 9–203(1)(b) of the Pennsylvania Commercial Code were not satisfied.

---

**6.** *See* Roper's brief at 7.

**7.** Roper Exh. 6 provides:

ROPER SALES CORP.
INTER–OFFICE MEMO      Date April 28, 1981
To Art Hall      From June Harling
SUBJECT      W J Clark Co., Ltd.
Westchester, PA

UCC–1's and Security Agreement had already been sent to Mr. W. Joseph Clark, President, at the time of our phone conversation on April 27th.

I am, however, enclosing UCC–1 forms again which we have executed and nedd [sic] only Mr. Clark's or another officer's signature prior to filing at Secretary of States office in Harrisburg.

Also, enclosed are checks and envelope with insturctions [sic] on what needs to be done with each.

Please advise if you have any questions upon receipt of the enclosed.

/s/  June Harling

cc: L.A. Rooney

**8.** Roper Exh. 7 provides:
FROM THE DESK OF
JUNE HARLING
Art Hall
File with Secretary of State's office as indicated on check. Return filing info received from their office with Security Agreement Mr. Clark has to sign to my attention.
JH
*See also* Exh. 8, n. 8 *infra.*

**9.** Roper Exh. 8 provides:
FROM THE DESK OF
JUNE HARLING
Art Hall
Mail after Mr. Clark has signed to Recorder of Deeds office at Westchester in envelope we are enclosing security agreement to be returned to K3.
/s/June 4/28
———
June
Please call me before filing as per our conversation
Thank you
/s/ DON